IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


| | | |
|---|---|---|
| Guardian Warranty Corp., | : | |
| | : | Case No. 1:07CV235 |
| Plaintiff, | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING IN PART |
| Brady W. Bulger, et al., | : | AND DENYING IN PART |
| | : | PLAINTIFF'S MOTION FOR A |
| Defendants. | : | PRELIMINARY INJUNCTION |
| | : | |
| | : | |

        This matter comes before the Court on Plaintiff's Motion for a Preliminary Injunction.

(Doc. 2.)  Plaintiff Guardian Warranty Corp. ("Guardian") filed both its Complaint (doc. 1) and

the Motion for a Preliminary Injunction (doc. 2) on March 23, 2007.  The Court held a hearing

on Plaintiff's Motion for a Preliminary Injunction on May 3, 2007.  For the reasons set forth

below, the Court **GRANTS** in part and **DENIES** in part Plaintiff's Motion.

I.      **BACKGROUND**

        Guardian filed the instant suit to seek enforcement of the noncompete clauses that

Defendants, Brady W. Bulger[1] and Bradley LeBlanc agreed to in signing their employment

contracts.  Guardian is engaged in the business of providing vehicle service contracts and

warranties to purchasers of new and used vehicles in numerous states, including Ohio.  A certain

number of Guardian representatives, or "Dealer Managers," cover sales territories in each state

_____

        [1] In its complaint, Plaintiff mistakenly named Brady W. Bulger as "Brody" W. Bulger.

1

and are primarily responsible for marketing Guardian's service warranties to vehicle dealerships within their respective territories.

Bulger and LeBlanc both served as Dealer Managers for the state of Ohio.  Guardian hired Bulger in January 1999 to cover primarily the northern half of Ohio and then hired LeBlanc as the Dealer Manager for the remainder of Ohio in December 2001.  Within weeks after accepting employment with Guardian, Bulger and LeBlanc each executed an employment agreement containing a covenant restricting their ability to compete with Guardian upon termination of their employment.  Specifically, both agreements provide as follows:

> d.       In the event the employment of EMPLOYEE is terminated for any reason Whatsoever [sic], the EMPLOYEE shall not solicit any of the GUARDIAN WARRANY [sic] CORPORTATION'S [sic] customers whom were serviced or whose name was learned by EMPLOYEE during his employment with THE GUARDIAN WARRANTY CORPORATION for a period of (1) one year from the termination of his employment.

> e.       In the event the employment of EMPLOYEE is terminated for any reason whatsoever, the EMPLOYEE expressly agrees that he will not engage in the same or similar business as that carried on by EMPLOYER, or work for any individual, firm, or corporation engaged in such line of [sic] similar line of business within a radius of 100 miles of the border of your personal sales territory for a period of one (1) year after the termination of his employment with EMPLOYER.

(Doc. 1, exs. A, B ¶ 3.)

As part of their employment, Bulger and LeBlanc were privy to confidential and proprietary business information, including Guardian's sales, marketing and business strategies as well as the identity and nature of Guardian's customers.  Bulger and LeBlanc additionally received at least some training in the field of vehicle service contract sales.  During the six to eight years that Bulger and LeBlanc worked for Guardian, they operated as direct liaisons between Guardian and its customers, and were for the most part exclusively responsible for

maintaining and developing business for Guardian in Ohio.[2]  Though based at their respective

homes, Bulger and LeBlanc worked primarily from their cars, servicing customers on a day-to-

day basis.  In this role, Bulger and LeBlanc cultivated professional relationships with vehicle

dealerships throughout Ohio.

Bulger and LeBlanc notified Guardian of their resignations during the first week of

March 2007.[3]  Shortly thereafter, Guardian learned that Bulger and LeBlanc were representing

direct competitors of Guardian and had contacted several of Guardian's customers to solicit

business.  Bulger and LeBlanc do not deny these allegations.  LeBlanc testified that the

atmosphere at Guardian had changed from professional and businesslike to increasingly hostile

and degrading.  As a result, he and Bulger decided to leave Guardian and to strike out on their

own as independent contractors.  Immediately upon leaving Guardian, Bulger and LeBlanc

contracted with two competing companies, National Auto Care and Driverz Edge, to market

vehicle service contracts for them.  Both Bulger and LeBlanc testified that after entering into

these contracts they attempted to solicit several of the customers they had serviced while at

Guardian.

While Defendants admit to contacting Guardian's customers, they point out that

Guardian does not have an exclusive contract with any of the dealerships.  Instead, one

dealership may have contracts with several companies like Guardian, all of whom provide

---

[2] Bulger and LeBlanc were also occasionally responsible for certain customers in the
bordering states of Kentucky and Pennsylvania.

[3] Both employees gave notice of resignation on May 2, 2007, though LeBlanc did not
officially resign until May 5, 2007.  LeBlanc had originally stated on May 2, 2007 that he was
giving two weeks notice, but after being told that the two week period was not necessary, he
made his resignation effective on May 5.

somewhat different vehicle service warranties.  In that way, the dealerships may offer more choices to their customers and help their customers to find the warranty best suited to the vehicle they are purchasing.  Accordingly, Defendants claim that though they were marketing service contracts for competing companies, the contracts were nonetheless different from the contracts Guardian offers.

After learning of Bulger and LeBlanc's new endeavors, Guardian sent letters to both men through certified mail insisting that they cease and desist their relationship with National Auto Care within 100 miles of the sales territories to which they were assigned while employed by Guardian, and that they also terminate efforts to solicit customers with whom they became acquainted or of whom they learned while employed by Guardian.  (See doc. 1, exs. C, D.)  After receiving no response from the Defendants, Guardian filed the instant suit, alleging claims for beach of contract and violation of Ohio's Trade Secrets Act, and sought a temporary restraining order, which the Court granted on March 23, 2006.  The parties then attempted to settle the dispute but were unable to negotiate a resolution.  Accordingly, the Court proceeded with the preliminary injunction hearing on May 3, 2007.

## II.    LEGAL STANDARD

Guardian's motion is governed by Fed. R. Civ. P. 65.  The decision whether or not to grant a request for interim injunctive relief falls within the sound discretion of the district court. Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 102 (6th Cir. 1982).  A preliminary injunction is an extraordinary remedy that should be granted only after consideration of the following four factors:  (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance

of preliminary injunctive relief would cause substantial harm to others; and (4) whether the
public interest would be served by issuance of preliminary injunctive relief. See Leary v.
Daeschner, 228 F.3d 729, 736 (6th Cir. 2000); see also Mason County Med. Ass'n v. Knebel,
563 F.2d 256, 261 (6th Cir. 1977).

## III.    ANALYSIS

Plaintiff seeks enforcement of the noncompete provisions in Defendants' employment
agreements. Though Bulger and LeBlanc recognize the existence of the noncompete
agreements, they nonetheless argue that a preliminary injunction should not issue because
Plaintiff cannot show a substantial likelihood of success on the merits of its claims.

### A.    Strong Likelihood of Success on the Merits

#### 1.    Breach of Contract

Defendants argue that Guardian's breach of contract claims will ultimately fail because
(1) under the three prong test set forth in Raimonde v. Van Vlerah, 42 Ohio St.2d 21, 325 N.E.2d
544 (1975), the noncompete agreements are unreasonable, particularly to the extent that the
territorial limitations are overbroad and not clearly defined; (2) the employment contracts are
unenforceable due to an extreme change in their employment conditions resulting in Defendants'
constructive discharge; (3) the agreements lacked consideration; and (4) Plaintiff has waived its
right to seek enforcement of the agreement.

##### a.    The Reasonableness of the Agreement

The parties agree that Ohio law governs the noncompete agreements. To the extent that
they are reasonable, such agreements are typically upheld under Ohio law. See Procter &
Gamble Co. v. Stoneham, 140 Ohio App. 3d 260, 747 N.E.2d 268, 275 (Ohio 2000). Where a

court finds certain portions of a noncompete agreement unreasonable, the court should nonetheless enforce the agreement "to the extent necessary to protect an employer's legitimate interest." Id. (quoting Raimonde, 42 Ohio St. 2d 21, 325 N.E.2d at 544, paragraph one of the syllabus).  "A non-compete agreement is considered reasonable, under Ohio law, if three conditions are met: (1) it goes no further than necessary to protect the legitimate interests of the employer; (2) it does not impose undue hardships on the employee; and (3) it is not injurious to the public."[4] Patio Enclosures, Inc. v. Herbst, 39 Fed. App'x 964, 968 (6th Cir. 2004) (citing Raimonde, 42 Ohio St. 2d 21, 325 N.E.2d at 547).

The noncompete agreements in this case essentially involve two prongs: (1) a customer-based restriction, and (2) a territorial limitation.  The customer-based restriction prohibits Defendants from soliciting any Guardian customers whom they had serviced or whose name they had learned while employed by Guardian, whereas the geographic limitation prohibits Defendants from working for any company or in any line of business similar to Guardian within 100 miles of the border of their respective sales territories.  Both prohibitions are subject to a one-year time limitation.

Based on the parties' testimony, the customer-based restriction appears to be reasonable to the extent it prohibits Defendants from contacting customers whom they had serviced while

_____

[4] In determining whether the covenant in question meets the three basic conditions set forth in Raimonde, the Court may consider a number of additional factors, including: "whether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and experience, whether the benefit to the employer is disproportionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment." Basicomputer Corp. v. Scott, 973 F.2d 507, 512 (6th Cir. 1992) (citing Raimonde, 325 N.E.2d. at 547).

6

working for Guardian.  As both parties indicated, Defendants Bulger and LeBlanc were the only Guardian Sales representatives covering Ohio.  While at Guardian, Defendants cultivated a substantial customer base – a base that they likely would not have developed but for their employment with Guardian.  Because they worked directly with the customers, often on a one-to-one basis, they developed longstanding professional relationships with and have gained the trust of many of Guardian's customers.  Indeed, Defendants admit that after leaving Guardian, they began marketing products very similar to those sold by Guardian to the same customers they had previously worked with through Guardian.

Were Bulger and LeBlanc permitted to continue to market competing vehicle service warranties to their previous Guardian clients, they would be at a decided advantage over any new sales representatives who Guardian may hire.  Guardian's representative, Mark C. Ehlmann, testified that in order for Guardian to continue to be competitive within Ohio it would need approximately one year to train new sales representatives and give those representatives time to establish relationships with Guardian's customers.  Prohibiting Defendants from contacting their prior Guardian customers during this time period will adequately protect Guardian.

As to the portion of the customer-based restriction prohibiting Defendants from contacting dealerships whose names they may have learned of but who they did not directly service while employed with Guardian, the Court finds this restriction to be overly broad and unenforceable.  It will prove nearly impossible for the parties to determine which dealerships may fall under this category.  Moreover, with regard to the dealerships that Defendants did not service, Defendants will be on equal footing with any new sales representatives Guardian may hire.  Accordingly, the restriction is unnecessary.

Applying the <u>Raimonde</u> test, a customer-based restriction that narrowly prohibits Defendants from contacting only the Guardian customers whom they have serviced would limit no greater activity than necessary to protect Guardian's legitimate interests in its continuing viability within Ohio. The restriction also would not impose undue hardships on Defendants. Defendants may still work within the vehicle service warranty industry; however, they will have to seek out new clients, other than those they came into contact with while at Guardian. Finally, Defendants did not argue and the Court sees no reason why this restriction would be in any way injurious to the public.

In contrast, the territorial limitation appears far more restrictive than necessary to protect Defendants' interests. As Defendants point out, their employment agreements do not clearly delineate the sales territories in which they were to operate. Nor did the geographic borders of their sales territories appear to have been clearly defined in practice. Recognizing that the Court may find it unreasonable to prohibit Defendants from engaging in similar work within 100 miles from the *unidentified* borders of these territories, Plaintiff suggested limiting the prohibition to 100 miles from the respective homes of each Defendant. Plaintiff claimed that this territorial limitation is necessary because were Defendants to continue working in this industry within those regions they would have an advantage over any new sales representatives Plaintiff hires due to the training and experience Defendants received while at Guardian. Plaintiff also contends that while Defendants worked for Guardian they were privy to certain confidential information, including knowledge of business plans, profit margins, and customer preferences. Defendants, on the other hand, argue that any such limitation would unduly burden their ability to support themselves and their families and may ultimately force them to relocate to another

region.

Plaintiff claims the restriction is necessary because without it, Defendants will be free to use the training and confidential information they learned at Guardian to unfairly compete with Guardian in the vehicle service contract industry.  As for the training, Plaintiff did little more than offer testimony that Defendants did not have experience in the vehicle service warranty industry before coming to Guardian and that they received training once they accepted employment.  Guardian did not explain the nature or the extent of the training.  Defendant LeBlanc testified that he did not actually receive much training from Guardian.  He recalled that when he started working for the company he was paired with another individual who had also just started and claimed that he received no formal training until several years after he had already been with the company and was familiar with the business.  Thus even though Defendants apparently learned the business during the early years of their employment with Guardian, and were presumably compensated for these efforts, Guardian does not appear to have provided any particularized training.

As for the confidential knowledge Defendants are alleged to have learned, Guardian's representative, Mark C. Ehlmann, testified that while they worked for Guardian, Defendants received bi-monthly and monthly reports showing the profile of the dealerships that had done business with Guardian in each representatives territory.  The profiles included information about the amount of claims paid on behalf of the dealership.  According to Ehlmann, this information would be beneficial to competitors because the claims ratio provides a useful measurement to determine the potential of a given dealer.  To the extent that Guardian is concerned that Defendants will benefit from this knowledge, the narrowed customer-based

9

restriction is an adequate protection.  Defendants will have little use for any information they may have gleaned from Guardian's customer profiles if they are prohibited from soliciting sales from those customers for a period of one year.

Rather than appearing necessary to protect Guardian's interests, the 100 mile territorial restriction that Guardian proposes is arbitrary.  Guardian is not based in Ohio and does not have a center of operations at either of the Defendants' homes.  Instead, Defendants both testified that they typically worked from their vehicles.  Guardian offered no evidence that Defendants had gained any specialized knowledge about the territory within those limitations such as would call for the imposition of a territorial restriction in addition to the already-sufficient customer-based restriction.  In other words, other than any dealer-specific knowledge Defendants posses, the experience and information Defendants take with them from Guardian does not appear to be territory specific – knowledge of Guardian's general business plans will be just as useful outside of the 100-mile radius as it would be within that territory.  Therefore, the only apparent purpose of the restriction would be to force Defendants to move or to drive long distances to solicit business if they intend to continue working in the vehicle service contract industry.  Defendants argue that such a result would unduly burden their ability to make a living.

Plaintiff argues that even if Defendants were effectively shut out of the industry, both Defendants are experienced salesmen and can work in other fields requiring sales expertise, including industries marketing other types of insurance.  Nonetheless, Defendants have worked in the vehicle service warranty industry for more than six to eight years, and transitioning into another field at this point in their careers may prove excessively difficult.  Given the random nature of the proposed territorial limitation and the Court's finding that the customer-based

10

restriction adequately protects Plaintiff's interests, any additional burden that would flow from the 100-mile restriction would amount to an undue hardship.  See Patio Enclosures, 39 Fed. App'x at 968 (finding that a district court did not abuse its discretion in determining that a noncompete agreement "that essentially required [the defendant employee] to move to another state to continue selling the product with which he was most familiar" was unreasonable).  As the Court finds that Plaintiff will not likely succeed in demonstrating that the territorial limitation is reasonable, the Court will not at this time enforce that portion of the noncompete agreement.

### b. Unenforceability Due to Extreme Change in Circumstances of Employment

Defendants next argue that due to an extreme change in the circumstances of their employment with Guardian from the time they were hired to the time they decided to leave the company, their employment contracts are unenforceable.  Specifically, Defendants argue that the following changes occurred:

> a. the marketing strategies and [sic] of the company had changed from the use of professional and business-like methods to the use of tawdry and sexually-oriented methods.

> b. the atmosphere within the Company had changed from being tolerable and professional to being degrading and demeaning and specifically with regard to the reference to and treatment of women both employed by the Company and those with whom defendants and others had to deal.

(Doc. 16 at 10.)  Defendants claim that these conditions became so objectionable that they were forced to resign.  In other words, Defendants contend that a hostile work environment led to their constructive discharge, and that by allowing these conditions, Guardian breached Defendants' employment agreements.

To prove constructive discharge, Defendants would have to show that Guardian (1) "deliberately create[d] intolerable conditions, as perceived by a reasonable person" (2) "with the intention of forcing" them to quit and (3) they actually must quit. See Moore v. KUKA Welding Sys. and Robot Corp., 171 F.3d 1073, 1080 (6th Cir. 1999). Courts consider the following non-exclusive list of factors, alone or in combination, when examining a constructive discharge claim:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

Logan v. Denny's, Inc., 259 F.3d 558, 569 (6th Cir. 2001). "Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." Pennsylvania State Police v. Suders, 542 U.S. 129, 149 (2004). A person who advances a claim of hostile-environment constructive discharge must show that conditions went beyond "ordinary" discrimination. See id. at 146-47 (citing Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.")).

Under the required objective assessment, Defendants must show "working conditions so intolerable that a reasonable person would have felt compelled to resign." Suders, 542 U.S. at 147. In this regard, the Court must, from the point of view of a reasonable member of the protected class, examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

12

performance." <u>Goldmeier v. Allstate Ins. Co.</u>, 337 F.3d 629, 635 (6th Cir.2003), cert. denied, 540 U.S. 1106 (2004).

Defendants testified to several occurrences at Guardian that they say led to the hostile work environment. First, LeBlanc testified that during a meeting, he got into an argument with Guardian's CEO and the CEO threatened physical violence. LeBlanc also testified that during a conference, the CEO pulled the Human Resources Director away from the podium during a presentation on the company's sexual harassment policy, and stated to the crowd that he had heard enough and was surprised Guardian had not been sued already. In addition to these incidents, Bulger testified to receiving several emails of a sexual nature from coworkers over several months. The first showed a picture of a woman wearing a bra and the second email included images of lions engaged in sexual interaction. Bulger also testified that he received a third email involving a joke about an Arab and Jewish man. Defendants both admitted that they did not report any complaints about the emails.

While these incidents may have been in poor taste, the conduct alleged is "not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993). As for the emails, they were neither pervasive nor threatening in nature. To prove a hostile work environment under Sixth Circuit precedent, the Defendants must allege more than being subjected to sporadic, racially or sexually charged comments. <u>See</u> <u>Smith v. Glenny Glass Co., Inc.</u>, No. 1:06cv638, 2007 WL 1202713, at *6-7 (S.D. Ohio Apr. 20, 2007). As to the alleged threat of violence LeBlanc received, there is no indication that the threat was in any way related to any form of actionable discrimination. LeBlanc does not, for example, testify

13

that he was threatened because he complained about the allegedly sexually charged environment. Moreover, this appears to have been an isolated incident.  Taken as a whole, the circumstances described by Defendants are not so intolerable that a reasonable person would feel compelled to quit.  Accordingly, these incidents do not render Defendants' employment contracts unenforceable.

### c.    Lack of Consideration

Defendants next claim that their noncompete agreements are not supported by valid consideration because they did not sign the agreements until several weeks after beginning to work for the company.  Guardian maintains that Defendants' continued employment with the company was sufficient consideration.  The Ohio Supreme Court has held that in an employment-at-will context, "consideration exists to support a noncompetition agreement when, in exchange for the assent of an at-will employee to a proffered noncompetition agreement, the employer continues an at-will employment relationship that could legally be terminated without cause."  Lake Land Emp. Group of Akron, LLC v. Columber, 101 Ohio St. 3d 242, 248, 804 N.E.2d 27, 32 (Ohio 2004).  Based on this precedent, the Court finds that the noncompete agreements at issue in this case are not void for lack of consideration.

### d.    Waiver

Defendants finally argue that Guardian waived its right to enforce the noncompete agreements against them by failing to enforce similar agreements against other former employees.  Regardless of whether or not this would actually amount to a waiver, Defendants presented no evidence in support of this argument.

### 2.    Violation of Ohio's Trade Secrets Act

In addition to its breach of contract claims, Plaintiff also alleges that Defendants violated the Ohio Trade Secrets Act, Ohio Rev. Code § 1333.61, by using confidential consumer and business information conveyed to them during their employment with Guardian.  The Court need not determine whether Plaintiff has proved a likelihood of success as to this claim because any injunction that flows from Plaintiff's breach of contract claims will be sufficient to protect Plaintiff against a potential violation of the Ohio Trade Secrets Act.

**B.    Irreparable Injury**

Defendants do not significantly address the remaining three factors the Court must consider in determining whether to issue a preliminary injunction.  Because Plaintiff has demonstrated a substantial likelihood of success as to its breach of contract claims, the Court must next determine whether Plaintiff will suffer irreparable injury if the preliminary injunction does not issue.

Defendants testified that they intend to continue working in the same industry as Guardian.  Plaintiff has shown that Defendants had already begun to solicit Guardian customers and did not cease these contacts until they received notice of the temporary restraining order issued in this case.  If Defendants are permitted to continue to solicit business from Guardian's customers, Guardian will not be in a position to compete with Defendants and will likely suffer an immeasurable loss of good will and a significant amount of business.  Accordingly, this factor weighs in favor of granting a preliminary injunction.  See Basicomputer Corp., 973 F.2d at 512 ("the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer"); Mike McGarry & Sons, Inc. v. Gross, No. 86603, 2006 WL 895094, at *5 (Ohio App. Apr. 6, 2006) ("Attempting to start one's own business by taking away

15

customers that were serviced by a former employer is precisely the type of irreparable harm that a covenant not to compete is designed to prevent.").

**C.    Substantial Harm to Others**

The parties do not dispute this prong, and indeed, the Court finds that no substantial harm to others will result from an order preliminarily enjoining Defendants from soliciting Guardian's customers for a period of one year.

**D.    Public Interest**

Like the question of whether a preliminary injunction will result in substantial harm to others, the parties do not substantially dispute the question of whether such an order would be in the public interest.  Plaintiff claims that the injunction would preserve the sanctity of contractual relations and prevent unfair competition.  The Court finds that, given the strong likelihood that Plaintiff will succeed on the merits, this factor also weighs in favor of granting Plaintiff's motion.

**V.    CONCLUSION**

Plaintiff has demonstrated a strong likelihood of success on the merits regarding partial enforcement of the parties' noncompete agreements, and the other factors to consider in granting a preliminary injunction weigh in Plaintiff's favor.  Accordingly, this Court **GRANTS IN PART** Plaintiff's Motion for a Preliminary Injunction.  (Doc. 2.)  The Court hereby **ENJOINS** Defendants LeBlanc and Bulger from soliciting any Guardian customers whom they serviced while employed by Guardian for a period of one year from the date of their respective resignations.

16

IT IS SO ORDERED.


                                                 ___s/Susan J. Dlott_____

                                                 Susan J. Dlott
                                                 United States District Judge